IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CAROL PETHTEL, individually and in
her capacity as Administratrix of the
Estate of THOMAS SAMUEL PETHTEL, JR.,
deceased, and as guardian ad litem for
TARA BROTHERS, TABITHA PETHTEL and
THOMAS S. PETHTEL, III,

       Plaintiff,

v.                                 Civil Action No. 5:06CV87
                                           (STAMP)

WEST VIRGINIA STATE POLICE,
COLONEL DAVID L. LEMMON,
SUPERINTENDENT OF THE
WEST VIRGINIA STATE POLICE,
SERGEANT GERALD L. MENENDEZ,
SERGEANT CHARLES F. TRADER,
FIRST SERGEANT DAVID B. MALCOMB,
FIRST SERGEANT L. SCOT GOODNIGHT,
CORPORAL R.L. MEFFORD and
TROOPER J.A. SIMMONS, individually
and in their capacity as members of
the Special Response Team-Alpha Team
of the West Virginia State Police,
CAPTAIN T. PHILLIPS, State Police
Commanding Officer in Ohio County,

       Defendants.

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
DISMISSING WITH PREJUDICE PLAINTIFF'S COMPLAINT
AND DENYING AS MOOT DEFENDANTS' MOTIONS IN LIMINE**

I.   Procedural History

The plaintiff in this action filed suit for claims arising out

of the death of Thomas Samuel Pethtel, Jr. ("Pethtel"), who was

shot by law enforcement officers after he had escaped from federal

custody. Carol Pethtel has brought this action on her own behalf;

in her capacity as administratrix of Pethtel's estate; and as

guardian ad litem for Pethtel's three children, Tara Brothers, Tabitha Pethtel, and Thomas S. Pethtel, Jr. The plaintiff alleges that the West Virginia State Police, the law enforcement officers who attempted to apprehend Pethtel after his escape, and the supervisors of those law enforcement officers violated Pethtel's constitutional rights by using excessive force to apprehend Pethtel, in violation of 42 U.S.C. § 1983, by executing an arrest plan that resulted in Pethtel's fatal shooting. The plaintiff also alleges state law claims for wrongful death, "survivorship action" and "the Tort of Excessive Force resulting in death."

The defendants filed a motion for summary judgment, in which they assert that the § 1983 claim does not survive Pethtel's death; that the plaintiff has failed to make the requisite showing of excessive force for her § 1983 claim; and that the defendants are entitled to qualified immunity. The plaintiff filed a response, to which the defendants have replied. This motion has been fully briefed and is now ripe for disposition. For the reasons set forth below, this Court finds that the plaintiff's § 1983 claim survives Pethtel's death, but that the defendants' motion for summary judgment must be granted because the plaintiff has failed to demonstrate a genuine issue of material fact that the defendants used excessive force, and because even if the defendants' conduct did constitute excessive force, the defendants are entitled to

qualified immunity.  Accordingly, the plaintiff's complaint must be dismissed with prejudice.[1]

## II.  Facts

Thomas Pethtel ("Pethtel") was a criminal defendant who had entered a plea agreement and was awaiting sentencing.  His sentencing hearing was scheduled for July 12, 2004, pending which he was released under house arrest at his sister's residence, subject to electronic monitoring.  At some time prior to July 12, 2004, during his period of house arrest, Pethtel removed his electronic monitoring device, and fled from federal custody.  After Pethtel failed to appear for sentencing, federal warrants were issued for his arrest.

Law enforcement officials learned of Pethtel's whereabouts on July 13, 2004, when they received a report from Patricia Grinage ("Grinage").  According to Grinage, Pethtel and his girlfriend, Randi Scott ("Scott"), had been residing for several days at the home of Pethtel's friend George Schlosser ("Schlosser"), where Grinage had also been living for a time.

---

[1]This memorandum opinion and order sets forth in more detail the tentative rulings provided to counsel by letter dated February 22, 2008.  Also pending before this Court are two motions in limine filed by the defendants (a motion in limine to preclude plaintiff from introducing unsupportable assertions that have no basis in facts, and a motion in limine to preclude plaintiff from introducing evidence that defendants should have attempted to capture Thomas Pethtel in some manner other than utilizing the special response team to enter the home).  In light of the ruling in this order dismissing the plaintiff's complaint, the pending motions in limine will be denied as moot.

Grinage informed the officers that Pethtel had a gun in the house; that he had been consuming cocaine; that he had threatened to kill her and her co-residents if they called the police; that he had gone for several days without sleep and was constantly watching the windows waiting for the police to find him; and that he was holding the occupants of the house against their will--allowing only one person to leave the house at any given time and threatening to kill the others if the person who left contacted the police or did not return. Grinage also told the officers that Pethtel had declared that he would not allow himself to be taken back to prison and that he would "go out in blaze of glory" by killing everybody in the house, including any police who came to arrest him. Further, Grinage informed the police that Pethtel had instructed her to purchase hollow point bullets for his gun.

Based upon the information provided by Grinage, the West Virginia State Police determined that any efforts to apprehend Pethtel involved a high degree of risk and imminent danger to the hostages and to law enforcement personnel. Accordingly, they summoned a Special Response Team ("SRT") to execute the apprehension. Team leader First Sergeant David B. Malcomb ("Malcomb") consulted various law enforcement sources, collecting additional information about Pethtel, which he then disseminated to the other SRT members. From his research, Malcomb learned that Pethtel was a large man who had previously been in prison and who

was prone to violently resisting arrest. Thus, as the SRT members prepared to apprehend Pethtel at Schlosser's home, the composite of information available to them from Grinage's report and Malcomb's research indicated that they would be entering into a hostage situation to apprehend an armed and violent felon, who had escaped federal custody to avoid further incarceration, and who had threatened to kill his hostages and any law enforcement officers attempting to return him to custody.

After assessing the situation, the SRT determined that a surprise breach of the Schlosser residence would be the most effective approach and would pose the least danger to the safety of the hostages and to the officers' own safety. During the late night hours of July 13, or the early morning hours of July 14, 2004, the SRT breached the back door of Schlosser's residence with a ram, then deployed "flash-bang" distraction devices and entered the house. The first person they encountered was Schlosser, who offered no resistance and was quickly secured without incident. In response to questions by SRT member Sergeant Gerald L. Menendez ("Menendez"), Schlosser stated that two other persons (Pethtel and Scott) were on the premises and that at least one of those persons had a gun. Menendez announced this information to the other SRT members.

Given the generally chaotic circumstances involved in the attempted apprehension of Pethtel and the rapidity with which the

subsequent events unfolded, the precise chronology of what occurred next is uncertain. However, the parties do not dispute that the following events occurred after the SRT members entered Schlosser's home and secured Schlosser.

Within a few seconds, SRT members located Pethtel, who had retreated with Scott to a bedroom. Pethtel grabbed Scott, held an object to her neck, and began repeatedly yelling threats that he would kill her if the police did not retreat. Although Pethtel apparently quietly told Scott that he would not harm her--an assurance which law enforcement officers did not hear--Scott nevertheless evidently feared for her life and loudly screamed for the officers' help.

Pethtel took Scott into a small bathroom, located in the interior of the bedroom. The door to the bathroom repeatedly opened and closed. Each time the door opened, Pethtel used Scott as a human shield, bobbing from side-to-side behind her, and continuing to hold to her neck what appeared to some of the SRT members to be a knife or some other weapon, but what later proved to be a piece of plasterboard. Throughout, Pethtel never stopped threatening to kill Scott, who never stopped screaming for help or begging Pethtel not to kill her.

At some point, in an effort to escape, Pethtel attempted to kick a hole in the wall through the bedroom into an adjoining laundry area. From the other side, SRT member Menendez observed

Pethtel appear and attempt to enter the laundry area through the hole and to drag Scott with him. Menendez fired a shot that wounded but did not kill Pethtel. At that point, Pethtel either withdrew from the escape hole or was knocked backward by the shot into the bathroom. SRT member Sergeant Charles F. Trader, who was positioned either in the hallway outside the bedroom, or in the bedroom itself, then fired the fatal shot.

Under this set of facts, the parties dispute whether the plaintiff's § 1983 claim survives Pethtel's death. They also dispute whether the force used by law enforcement personnel was excessive and whether the defendants are entitled to qualified immunity.

### III. <u>Applicable Law</u>

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718-19 (4th Cir.

1991), <u>cert. denied</u>, 502 U.S. 1095 (1992)(citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)).

"[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256. The Court must perform a threshold inquiry to determine whether a trial is needed -- whether, in other words, "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250; <u>see also</u> <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979)(Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law.")(citing <u>Stevens v. Howard D. Johnson Co.</u>, 181 F.2d 390, 394 (4th Cir. 1950))).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. Summary judgment is not appropriate until the non-moving party has had sufficient

opportunity for discovery. See <u>Oksanen v. Page Mem'l Hosp.</u>, 912
F.2d 73, 78 (4th Cir. 1990).

On a motion for summary judgment, a court reviewing the
supported underlying facts must view all inferences in the light
most favorable to the party opposing the motion. <u>See Matsushita
Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).
Further, when evaluating an assertion of qualified immunity under
summary judgment, a court must take all facts "'in the light most
favorable to the party asserting the injury.'" <u>Clem v. Corbeau</u>,
284 F.3d 543, 550-51 (4th Cir. 2002)(quoting <u>Saucier v. Katz</u>, 533
U.S. 194, 201 (2001)). "The burden of proof and persuasion with
respect to a claim of qualified immunity is on the defendant
official." <u>Wilson v. Kittoe</u>, 337 F.3d 392, 397 (4th Cir. 2003)
(citing <u>Gomez v. Toledo</u>, 446 U.S. 635, 640-41 (1980)).

## IV. <u>Discussion</u>

The plaintiff alleges that the defendants, acting in concert
and in furtherance of official policy, custom, and training,
violated Pethtel's civil rights by using physical and deadly force
in their attempts to arrest him. The plaintiff also claims that
the alleged excessive force gives rise to state law claims for
wrongful death, "a survivorship action," and the "Tort of Excessive
Force resulting in death."

In their motion for summary judgment, the defendants assert
two broad arguments. First, they contend that under West Virginia

law, the alleged damages suffered by Pethtel before his death do not survive his death and that, accordingly, the plaintiff's § 1983 civil rights claim cannot proceed. Second, the defendants contend that the force they used in their efforts to apprehend Pethtel was reasonable. In the absence of a showing of excessive force, they argue, two results follow: (1) the plaintiff cannot prove a necessary element of her § 1983 claim, and (2) the plaintiff cannot show a constitutional injury, which entitles the defendants to qualified immunity, thereby defeating all of the plaintiff's claims.

This Court first addresses the question of whether the plaintiff's § 1983 claim survives Pethtel's death before turning to the questions of whether the plaintiff has presented a genuine issue of material fact on her claims arising out of the alleged use of excessive force by law enforcement personnel and, separately, whether any or all of the defendants are entitled to qualified immunity.

A.   Survival of § 1983 Claim

In this action, the parties dispute whether the § 1983 claim for the alleged constitutional violations resulting in Pethtel's death may be brought by his estate. Pursuant to 42 U.S.C. § 1983, a victim of a constitutional rights violation by a state actor may seek redress for damages. See 42 U.S.C. § 1983. To determine the validity of § 1983 claims in cases where federal laws are not

"suitable" or "adapted to the object" of protecting and vindicating civil rights, 42 U.S.C. § 1988(a) requires courts to apply state law as a gap-filler. Robertson v. Wegmann, 436 U.S. 584 (1978). However, § 1988 also dictates that courts are not to apply any state law that is "'inconsistent with the Constitution and laws of the United States.'" Id. at 588 (quoting 42 U.S.C. § 1988(a)). Under § 1988 and Robertson, then, the inquiry consists of three parts: (1) whether federal law addresses the issue in question; (2) if federal law does not address the issue, whether an applicable state law addresses the issue; and (3) whether the applicable state law is consistent with the Constitution and laws of the United States.

In this case, federal law does not address whether a § 1983 action survives the death of the alleged victim of a constitutional violation. Accordingly, this Court must look to West Virginia law as a potential gap-filler. See Jones v. George, 533 F. Supp. 1293, 1300 (S.D. W. Va. 1982). The defendants direct this court's attention to Bell ex rel. Bell v. Board of Educ. of County of Fayette, 290 F. Supp. 2d 701, 709 (S.D. W. Va. 2003), to support their position that, for § 1983 purposes, causes of action for personal injuries which result in death do not survive the injured party's death. By contrast, the plaintiff relies upon Green ex rel. Green v. City of Welch, 467 F. Supp. 2d 656 (S.D. W. Va. 2006), to support her argument that West Virginia law permits West

Virginia's wrongful death statute to operate as a proper gap-filler in a § 1983 action to redress constitutional claims for injuries resulting in death.

In Bell, the United States District Court for the Southern District of West Virginia concluded that the wrongful death statute created a new and independent cause of action in the decedent's survivors, which supplanted any claim the decedent would have had under § 1983. Bell, 290 F. Supp. 2d at 709. Accordingly, the Bell court dismissed the plaintiff's § 1983 claim because it found that West Virginia law did not recognize a § 1983 cause of action by the estate or representative of the party who suffered an alleged constitutional violation. Id.

Three years after Bell, the United States District Court for the Southern District of West Virginia revisited the question in Green. There, the court observed that Bell failed to consider whether the application of state law would be inconsistent with the Constitution and laws of the United States, as required by § 1988(a). Green, 467 F. Supp. 2d at 663-64. Applying the required analysis, the Green court found that a § 1983 claim for injuries resulting in death does, in fact, survive the death of the injured party because West Virginia's wrongful death statute is an appropriate gap-filler. Id. at 664. The court rejected the notion that state remedies may be substituted outright for the remedy provided by § 1983. Rather, the federal remedy under § 1983 is

supplementary to the state remedy, and survival of a § 1983 claim is needed to protect the federally created rights. Id.

The Green court also observed that the weight of authority supported its conclusion. Id. at 663. As the court noted, West Virginia case law before Bell clearly permitted a § 1983 claim for injuries to a person resulting in death to survive that person's death. Id. The court further observed that, although the United States Court of Appeals for the Fourth Circuit appears not yet to have ruled on the issue, all of the circuits to have done so--the United States Courts of Appeals for the Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits--have recognized the survival of a § 1983 claim where the alleged constitutional violation has resulted in the death of the victim. Id. (citing Carringer v. Rodgers, 331 F.3d 844, 850 (11th Cir. 2003); Andrews v. Neer, 253 F.3d 1052, 1057-58 (8th Cir. 2001); Baker v. Putnal, 75 F.3d 190, 195 (5th Cir. 1996); Berry v. City of Muskogee, 900 F.2d 1489, 1504-07 (10th Cir. 1990); Bass v. Wallenstein, 769 F.2d 1173, 1189-90 (7th Cir. 1985); Jaco v. Bloechle, 739 F.2d 239, 242-45 (6th Cir. 1984); Brazier v. Cherry, 293 F.2d 401, 407-09 (5th Cir. 1961)). Accordingly, the Green court held that the plaintiff's § 1983 claim seeking recovery under a theory of wrongful death survived the death of the injured party. Id. at 664.

This Court is persuaded by the analysis undertaken by the Green court. Thus, to the extent that the plaintiff's claim

pursuant to 42 U.S.C. § 1983 seeks recovery under a theory of wrongful death, it survives Pethtel's death. However, the plaintiff's claim ultimately fails in any event because, as discussed below, the plaintiff has failed to make the requisite showing concerning excessive force for her § 1983 claim, and because even if the defendants' conduct did constitute excessive force, the defendants are entitled to qualified immunity.

B.    Section 1983 Claim

Title 42, United States Code, Section 1983 provides redress for state action which deprives a citizen of a right, privilege or immunity ensured by the Constitution or law of the United States. See 42 U.S.C. § 1983. A claim of excessive force by a law enforcement officer implicates the constitutional rights of an individual to be free from unreasonable search and seizure under the Fourth Amendment.[2] Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996). To determine whether the alleged conduct constitutes excessive force in violation of the Fourth Amendment, a court must apply a standard of objective reasonableness. Graham v. Connor, 490 U.S. 386, 395 (1989). Specifically, a court must determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of

_____

[2]The Fourth Amendment guarantees "that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV.

14

force." Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001) (citing Graham, 490 U.S. at 395). A reviewing court is not to weigh an officer's conduct through the lens of "20/20 hindsight" when evaluating reasonableness. Graham, 490 U.S. at 396. Rather, "a particular use of force must be judged from the perspective of a reasonable officer on the scene." Id. The exclusive focus of the inquiry should be on the information known to the officer or officers "'*immediately prior to and at the very moment [they] fired the fatal shot*.'" Greenidge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991)(quoting Ford v. Childers, 855 F.2d 1271, 1275 (7th Cir. 1988) (quoting, in turn, Sherrod v. Berry, 856 F.2d 802, 805 (7th Cir. 1988))); see also Elliott, 99 F.3d at 642 (4th Cir. 1996)("The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection.").

The reasonableness inquiry requires a court to examine all of the surrounding facts and circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. In undertaking this analysis, a court must remain cognizant that law enforcement officers "are forced to make split-second judgments--in circumstances that are tense, uncertain, and

rapidly evolving--about the amount of force that is necessary in a particular situation." Id. at 396-97.

The use of deadly force implicates special considerations under the reasonableness analysis. "A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." Elliott, 99 F.3d at 642 (citing Tennessee v. Garner, 471 U.S. 1 (1985)). However, deadly force is not justified when it is used seconds after a passing threat has been eliminated "if a reasonable officer would have recognized when the force was employed that the threat no longer existed." Waterman v. Batton, 393 F.3d 471, 482 (4th Cir. 2005). Nevertheless, "a mistaken understanding of the facts that is reasonable in the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment." Milstead v. Kibler, 243 F.3d 157, 165 (4th Cir. 2001); see also Maryland v. Garrison, 480 U.S. 79, 87 (1987) (recognizing "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests").

1. The Factual Circumstances

Here, this Court must examine the circumstances and the information known to the SRT members immediately before the fatal shot was fired. According to the affidavits and the pleadings submitted by the parties, the SRT members knew that Pethtel had a

gun.  They knew that Pethtel had asked Grinage to purchase hollow

point bullets, which are more destructive than regular bullets.[3]

They knew that Pethtel had stated he would kill everyone in the

Schlosser home and any law enforcement personnel who attempted to

take him back into custody.  Further, the SRT members were aware

that Pethtel was seeking to evade arrest by taking a hostage and

attempting to flee.  They also knew that Pethtel had a history of

violent behavior.  Additionally, at the instant the fatal shot was

fired, the SRT members--just moments before--had seen Pethtel

holding Scott as a hostage and pressing to her neck what appeared

to some of them to be a weapon.  Finally, they had heard Pethtel

repeatedly threaten to kill his hostage and had heard the hostage's

constant pleas imploring Pethtel not to kill her and screaming for

the SRT members to help her.  Menendez fired the first, non-lethal

shot when Pethtel appeared with Scott through his escape hole.

Trader fired the second, fatal shot moments later, after Pethtel

had returned to the bathroom.

    2.  The Plaintiff's Contentions

    The plaintiff claims that a genuine issue of material of fact

exists as to whether Pethtel continued to pose a danger after the

first shot was fired because the parties have submitted conflicting

evidence on whether Pethtel was standing upright, sitting slumped,

or lying prone when the second, fatal shot was fired.    The

_____

    [3] See Wilson v. Ozmint, 352 F.3d 847, 853 (4th Cir. 2003).

plaintiff argues that in contrast to the officers' deposition testimony, the physical evidence suggests that after the first shot was fired, Pethtel was no longer standing and, therefore, had ceased to pose a threat to his hostage or to the officers on the scene. As support, the plaintiff offers her expert's report on blood splatter and bullet trajectory. Further, the plaintiff contends that statements made by Scott after the event support the conclusion that Pethtel was no longer standing and that he had ceased to be a danger. Finally, the plaintiff contends that the time which elapsed between the first, non-fatal shot and the second, lethal one--a period the plaintiff alleges lasted up to one minute--indicates that the use of deadly force was unreasonable under the circumstances.

3.    <u>Application of Fourth Amendment Analysis to Excessive Force Claim</u>

When viewed in the light most favorable to Pethtel, as the injured party, the facts reveal that none of the officers used excessive force in their efforts to apprehend Pethtel. For purposes of this discussion, this Court finds it useful to analyze the force used by the officers on the scene who did not discharge their weapons separately from that used by the officers who either discharged their weapons or gave the order permitting lethal force.

a.  Officers on the Scene Who Did Not Discharge Their Weapon

The officers on the scene who did not discharge their weapons include Trooper J.A. Simmons ("Simmons"), Corporal R.L. Mefford ("Mefford"), and First Sergeant L. Scot Goodnight ("Goodnight"). Simmons breached the Pethtel residence with a battering ram, but he fired no shots and had no physical contact with Pethtel. Mefford, who entered the residence after it had been breached and who was responsible for managing the canine, exited the home to retrieve the canine after Pethtel retreated to the bedroom with Scott. Mefford did not employ the canine at any time, nor did he fire any shots or have physical contact with Pethtel. Goodnight, who was the first officer to enter the residence after it was breached, used flash-bang distraction devices to subdue and confuse the occupants. Goodnight fired no shots and had no physical contact with Pethtel. In the absence of any physical contact or shots taken, this Court finds that defendants Simmons, Mefford, and Goodnight did not use excessive force, and they are therefore entitled to summary judgment on the plaintiff's § 1983 claim.

b.  Officers on the Scene Who Ordered that Shots be Taken or Discharged Their Weapons

The remaining officers on the scene include First Sergeant David B. Malcomb, Sergeant Gerald L. Menendez, and Sergeant Charles F. Trader. Like the defendants discussed above, Malcomb, who was

the team leader for the SRT, fired no shots and had no physical contact with Pethtel. However, after the failed efforts by SRT members to persuade Pethtel to surrender, which included both verbal attempts and the use of flash-bang devices, Malcomb instructed the officers to take a shot if one opened. Menendez fired the first, non-lethal shot when Pethtel appeared through the hole Pethtel had kicked in the wall in an effort to escape. Trader then fired the shot that killed Pethtel. These actions must be considered in the context in which they occurred. Immediately before Malcomb gave the order permitting the officers to shoot and at the moment the officers fired at Pethtel, all of the officers on the scene reasonably believed that Pethtel was armed and dangerous; they knew that he was attempting to evade arrest; they knew that he had stated his intent to "go out in a blaze of glory" when law enforcement officials came to arrest him; they knew that he was ignoring their commands; they knew that he was threatening to kill his hostage; and they knew that his hostage was pleading with him not to kill her and was screaming for them to help her. It does not appear that Pethtel at any time stated, or otherwise indicated, an intent to release his hostage or to surrender. In short, Pethtel, who had escaped federal custody and was actively resisting arrest, appeared to pose an immediate threat to the safety of the officers and the hostage.

Under these circumstances, this Court finds that a reasonable officer would have believed that Pethtel posed a threat of serious physical harm to them and to his hostage and that such threat had not ended after the first, non-fatal shot was fired. Additionally, this Court finds that whether Pethtel was lying prone, sitting slumped, or standing upright after the first shot does not change the nature of the rapidly evolving and chaotic circumstances in which the SRT members were required to act or the imminent threat reasonably perceived by the officers up to and at the moment immediately before the fatal shot was fired. Nor does an elapsed period of up to one minute between the firing of the first and second shots change the analysis. Accordingly, this Court finds that the plaintiff has failed to demonstrate a genuine issue of material fact that defendants Malcomb, Menendez, and Trader acted with excessive force and, therefore, these defendants are entitled to summary judgment on the plaintiff's § 1983 claim.

C.   Qualified Immunity

Even if any of the defendants' conduct constituted excessive force on the merits, all of the defendants would nonetheless be entitled to summary judgment because they are protected by qualified immunity. Analysis of a qualified immunity defense by a law enforcement officer requires a two-part inquiry. Saucier v. Katz, 533 U.S. 194, 201 (2001). The first question is whether the facts alleged, when viewed in the light most favorable to the

injured party, "show the officer's conduct violated a constitutional right." Id. If the facts alleged fail to make this showing, the inquiry is at an end, and the officer or officers are entitled to summary judgment. See id. If, however, the facts alleged do show a constitutional injury, the second question is whether the constitutional right was clearly established at the time of the violation. Id. Qualified immunity is abrogated only upon a showing that the officer's conduct violated a constitutional right and that such right was clearly established at the time the conduct occurred. Id.

The question is not whether the Fourth Amendment retribution against the use of excessive force was clearly established at the time, but is, rather, a more specific inquiry into whether a clearly established prohibition existed against the application of the particular force used under the particular circumstances in which it was used. See id.; see also Brosseau v. Haugen, 543 U.S. 194, 198-200 (2004)(identifying the relevant question there as "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight"). However, that a defendant's conduct constitutes a constitutional violation under clearly established law "does not require that the 'very action in question [have] been previously held unlawful[.]'" Robles v. Prince George's County, 302 F.3d 262, 270 (4th Cir. 2002) (quoting Wilson v. Layne, 526

U.S. 603, 615 (1999) (internal citations and quotation marks omitted)). Rather, the proper inquiry is whether the unlawfulness of the conduct would have been apparent to a reasonable officer under the circumstances in light of pre-existing law. Saucier, 533 U.S. at 201-202; Wilson, 526 U.S. at 609.

In this action, the question is (1) whether the force used by the SRT was excessive, thereby constituting a constitutional injury, where such force was used to subdue an apparently armed, violent felon who had escaped from federal custody, who was holding and threatening a hostage, and who was intent on avoiding capture; and, (2) if the force used was excessive, whether a reasonable officer under the circumstances would have known that such force was unlawful. As discussed above, this Court has found that no excessive force was used and, therefore, Pethtel suffered no constitutional injury. However, even if any of the officers' conduct were to be deemed excessive force, which this Court does not find, the second inquiry is whether the unlawfulness of the officers' conduct under the specific circumstances was clearly established at the time such conduct occurred.

The plaintiff urges the view that the reasoning in Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005), is controlling in this case. In Waterman, the United States Court of Appeals for the Fourth Circuit, overruling the lower court's denial of summary judgment based upon qualified immunity, found that law enforcement officers

acted with excessive force by continuing to shoot at a moving vehicle after it had passed them and ceased to pose a threat to the officers' safety. According to the plaintiff in this action, the unlawfulness of using deadly force against a suspect who no longer poses a threat was well established under Fourth Circuit law on July 14, 2004, the date on which Pethtel was fatally shot. In support of this conclusion, the plaintiff argues that even though the Fourth Circuit ultimately determined that the right was not clearly established at the time the Waterman defendants fired their shots at the fleeing vehicle, the district court which initially denied the Waterman defendants' claims of qualified immunity had entered its ruling on December 11, 2003, several months before Pethtel's shooting death. Further, the plaintiff directs attention to that portion of Waterman which recognizes that "other circuits decided during this period that a passing risk to an officer does not authorize him to employ deadly force moments after he should have recognized the passing of the risk." Waterman, 393 F.3d at 483 (citing Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999); Dickerson v. McClellan, 101 F.3d 1151, 1162 n.9 (6th Cir. 1996); and Ellis v. Wynalda, 999 F.2d 243, 247 (7th Cir. 1993)). The plaintiff contends that, taken together, the district court decision in Waterman and the decisions of the other circuits cited by the Fourth Circuit demonstrate that the defendants' conduct

clearly constituted excessive force under the well established law
at the time.

This contention is unavailing for two reasons. First, the law
as set forth in <u>Waterman</u> was not well established at the time the
defendants used lethal force against Pethtel. <u>Waterman</u> itself was
not decided until January 3, 2005, several months after the events
giving rise to this suit. Additionally, the Fourth Circuit found
that the police officers in <u>Waterman</u> were entitled to qualified
immunity because the law was not clearly established at the time of
their conduct. <u>Waterman</u>, 393 F.3d at 483. The Fourth Circuit
reached this conclusion because the Fourth Circuit had not
addressed the issue at the time the <u>Waterman</u> officers' conduct
occurred, in November 2000. <u>Id.</u> Given that the events in this
case also occurred before the Fourth Circuit addressed the issue,
this Court cannot conclude that the law was clearly established
when the SRT members engaged in the conduct in question.

Second, even if the law as set forth in <u>Waterman</u> was well
established on July 14, 2004, it is not applicable to the facts of
this case. <u>Waterman</u> concerned the force used in circumstances
where the victim presented a passing risk which had clearly ended.
<u>Id.</u> at 482. Specifically, it dealt with the difference between
lethal force used in the face of risk posed to officers' safety by
an oncoming vehicle and the lethal force used after the vehicle had
passed the officers. <u>Id.</u> at 479-82. The Fourth Circuit concluded

that the initial use of force--gunshots fired by the officers as the vehicle approached them--was reasonable because of the threat the vehicle posed to the officers' safety but that the subsequent use of force--gunshots fired after the vehicle had passed them--was not justified because the threat to the officers' safety had ended once the vehicle passed them. Id.

Unlike Waterman, which deals with a passing risk that has clearly ended, this case concerns an ongoing risk of threat to the safety of the officers and to the safety of a hostage. Waterman does not establish that the use of deadly force against an apparently armed, violent, escaped felon threatening to kill a hostage is excessive when the threat posed is not a passing risk but a continuous one, which, if it had ended, had not clearly done so.[4]

In sum, even if the officers acted with excessive force constituting a constitutional injury, which this Court does not find, this Court concludes that the unlawfulness of the officers' conduct was not clearly established at the time it occurred.

---

[4]Even assuming that the threat had ended, qualified immunity protects law enforcement officers from liability for making "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Maciarello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). Here, at most, the defendants made a bad guess in a gray area. Even if the fatal shot were a mistake, because the threat had ended, it was an objectively reasonable mistake under the circumstances.

Accordingly, this Court concludes that the officers are entitled to qualified immunity.

D.  Supervisory Claims Under § 1983

To establish a claim against the West Virginia State Police, the plaintiff must prove that the officers were executing a custom or policy of the West Virginia State Police when the alleged constitutional violation occurred.  Monell v. Dept. of Soc. Servs. of the City of New York, 436 U.S. 658 (1978).  Similarly, to establish a liability against individually named supervisory defendants, the plaintiff must show "(1) that the supervisor[s] had actual or constructive knowledge that [their] subordinate[s] [were] engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]; (2) that the supervisor[s'] response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practice; and (3) that there was an affirmative causal link between the supervisor[s'] inaction and the particular constitutional injury suffered by the plaintiff[s]."  Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).  Thus, plaintiff's claims against the West Virginia State Police or any individual supervisory defendant are predicated upon a showing of constitutional injury.

As discussed above, the force employed by the SRT members to apprehend Pethtel does not constitute excessive force.

Accordingly, the plaintiff's failure to establish a constitutional injury is fatal to her § 1983 supervisory claims against the West Virginia State Police and individually named supervisory defendants. Furthermore, even if the plaintiff had established a constitutional injury, the supervisors are entitled to qualified immunity because, as discussed above, such injury was not clearly established at the time.

E.    <u>State Tort Claims</u>

In addition to her § 1983 claim, the plaintiff's complaint includes state law causes of action for wrongful death, "survivorship," and "Tort of Excessive Force resulting in death." As a general matter, West Virginia's Governmental Tort Claims and Insurance Reform Act, W. Va. Code §§ 29-12A-1, <u>et seq.</u>, provides that a political subdivision is immune from liability resulting from the method of providing police, law enforcement or fire protection. W. Va. Code § 29-12A-5(a)(5). "The phrase 'the method of providing police, law enforcement, or fire protection' contained in W. Va. Code § 29-12A-5(a)(5) refers to the decision-making or the planning process in developing a governmental policy, including how that policy is to be performed." <u>Smith v. Burdette</u>, 566 S.E.2d 614, 618 (W. Va. 2002). Furthermore, employees of a political subdivision are generally immune from any loss or claim unless they act: (1) outside the scope of employment, (2) with malicious purpose, in bad faith or in a wanton or reckless manner, or (3)

liability is specifically expressed by law.  W. Va. Code § 29-12A-5(b)(1)-(3).

Here, to the extent that the plaintiff asserts claims against the defendants for their policy, training, or decision-making concerning the deployment of the Special Response Team, this Court finds that the defendants were providing police or law enforcement protection under the purview of West Virginia Code § 29-12A-5(a)(5) and are therefore immune from liability on the plaintiff's state law tort claims.  Moreover, to the extent that the plaintiff's claims arise from the individual officers' conduct in the attempted apprehension of Pethtel, this Court finds that the law enforcement officers were operating within the scope of their employment and without malicious purpose, in bad faith or in a wanton or reckless manner.  Therefore, this Court finds that the plaintiff's state law claims against the defendants are barred as a matter of law and must be dismissed.

However, even if the plaintiff's claims are not barred by West Virginia's Tort Claim Act, the plaintiff's failure to establish the use of excessive force is fatal to her state tort claims, as discussed below.

1.  Wrongful Death Claim

As discussed above, the plaintiff's § 1983 claim survives Pethtel's death to the extent that they rest upon wrongful death claims under West Virginia law.  A showing of wrongful conduct,

negligence, or default is required to prevail on a claim for wrongful death. Bradshaw v. Soulsby, 558 S.E.2d 681, 687 (W. Va. 2001) (citing W. Va. Code § 55-7-5). Because the defendants' conduct does not constitute excessive force, the plaintiff cannot show a constitutional injury. In the absence of a constitutional injury, the plaintiff cannot establish wrongful conduct. In the absence of wrongful conduct, the plaintiff's state law wrongful death claim must fail.

2. "Survivorship" and "Tort of Excessive Force"

Finally, in Counts III and IV of her complaint, the plaintiff asserts claims for, respectively, "a survivorship action under state law" and "the Tort of Excessive Force resulting in death." This Court construes Count III to constitute a claim that Pethtel's § 1983 claim survives his death and Count IV to constitute a state law variation of the plaintiff's federal § 1983 claim. Because this Court has determined that the defendants did not use excessive force--and that even if they did use excessive force, they are nonetheless entitled to qualified immunity--the defendants must be granted summary judgment on these counts.

V. Conclusion

For the reasons set forth above, and viewing the facts in the light most favorable to the plaintiff, this Court finds that the plaintiff has failed to establish a genuine issue of material fact concerning her allegations of excessive force and that the

defendants did not act with excessive force.  This Court further
finds that even if the defendants' conduct constitutes excessive
force, the defendants are entitled to qualified immunity on all
counts.  Accordingly, the defendants' motion for summary judgment
is GRANTED.  Additionally, the defendants' motion in limine to
preclude plaintiff from introducing unsupportable assertions that
have no basis in fact is DENIED AS MOOT.  Further, the defendants'
motion in limine to preclude plaintiff from introducing evidence
that defendants should have attempted to capture Thomas Pethtel in
some manner other than utilizing the special response team to enter
the home is DENIED AS MOOT.  It is ORDERED that this civil action
be, and is hereby, DISMISSED WITH PREJUDICE and STRICKEN from the
active docket of this Court.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum
opinion and order to counsel of record herein.  Pursuant to Federal
Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment
on this matter.

DATED:   July 29, 2008


/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE